Mr. Sibley. May it please the Court. This is an important case, I think, for Internet jurisdiction in general, but specifically for libel purposes. Because this is a case where we have a national publication through a website. And, of course, as the Court knows, there's very few in-print publications that people read anymore. Pretty much everything is online now. So the Court has kind of zoned in on an issue, and the note that we got about the case is the Court wanted us to look at. And that was the Keaton v. Hustler case. And that's a case that deals with the market exploitation theory through print publications. And we didn't really focus on that in our briefing because that had a physical presence in the state. I wasn't really sure if it would be applicable to this case. So we focused really more on the Zippo line of cases. But the Court has kind of zeroed in on a case, I think, it's the Mavericks case, that sort of seeks to synthesize what we see in Keaton v. Hustler with Zippo. But before I get into that, I want to talk about the background, undisputed jurisdictional facts. Okay, wait a minute. Keaton was decided in 1984 when there weren't – I mean, I'm told that the Internet had been invented by then, but I can remember that time frame. It wasn't available to anyone. So that was the only thing. You got newspapers, you know, that were printed. Now, as you say, it's largely online. Why doesn't – so you don't think Keaton applies here? I do think it applies from a rationale perspective. Okay, so can you explain that? If you look at the jurisdictional principles in the case, and I'm just going to – I'm going to give you how I capture the holding in that case. That was a case where basically the plaintiff had to form shop to find somewhere they could sue because the limitations had ran everywhere else, and apparently New Hampshire has a really long statute of limitations for libel of six years. I don't know if it's still the case, but it was then. And so the hook, the jurisdictional hook that they used, the plaintiff didn't even live in New Hampshire. The jurisdictional hook was, well, look, you circulate about 10,000 to 15,000 copies of this magazine physically in the state to subscribers. And I believe the First Circuit looked at that and said, well, look, that's just not fair to hail them into court in New Hampshire because the plaintiff doesn't even live there, and that's just such a small percentage of the business. We kind of know what you're doing. You're trying to form shop, and you couldn't bring the suit anywhere else, so we just don't think it's fair under the sort of traditional notions of fair play and substantial justice. And the Supreme Court looked at that and said, look, first we have to look at the minimum contacts. We don't get ahead of ourselves here and look at the result. We look at the minimum contacts. And the reality is, and I think the holding of the court is best captured on pages 7, 79 through 80, carrying on a part of your general business in a forum is considered purposeful available. Even if it's a small percentage of your general business, if you are intentionally conducting your general business, even a small part of it in a forum state, that is sufficient minimum contacts to justify jurisdiction. And the way the court described that, as we now know it, is the market exploitation theory. So basically if you're continually and systematically doing business, even a small amount, in a particular forum, then that is sufficient for minimum contacts. And again, there's a very small percentage of publications of that magazine in New Hampshire. In this case, we have a nationwide news service that mainly publishes stories. I think it's exclusively pretty much online. The jurisdictional facts are, and this is from the defendant, 8% of the readers who clicked on that story were in Texas. And they sort of say, well, that's not really significant. Well, it actually… It's more than Keaton in terms of percentage. It is. And it's more than UMG Recordings, which is a case I'll talk about in a moment, which is actually less than 1% of all the people who looked at it were in the state of Virginia. So 8% is a lot, and we don't even know, because they don't disclose it, we don't know what percentage of that is in the United States, right? Because that's just 8% of the total readers. So imagine if 10%, and it could be more, I don't know, people who view the article are outside the U.S. Well, that means it's actually a greater percentage relative to the U.S. as to people who looked at that in Texas. But according to, as I understood your explanation, the Supreme Court has said conducting your business is tantamount to purposeful availment, then the percentage really doesn't matter. If there's any contact at all with any of the 50 states, then that would be enough. Well, I don't know if it would be any contact, Your Honor, because it can't be just a random isolated contact. It has to be systematic and continuous. And so I don't think we get there from the 8%. The way we get there, and I think it's pretty clear from the rationale of these other cases, UMG Recordings and Mavericks and UBIT Incorporated, is when you have, and this is undisputed, it's an undisputed jurisdictional fact, when you have a targeted marketing site where as part of the terms of service, when I go onto your site and I accept cookies and I click on these articles, I'm sharing information with you. That information is then used to sell advertising for targeted marketers. That's undisputed. It's in their terms of service. And so if you look at just the screenshot we captured from accessing the site here in Texas, what's on the home page? It's a Texas-based advertisement. So what the UMG Recordings case says is when you have a supposedly free website, it's not really free if what you're doing is eliciting information from the people who read it for free and then selling that information to third parties who you then profit from from targeted advertising. So what the UMG Recordings case says is, look, that's purposeful availment. When you are gathering data geographically from users and then profiting in that forum, that is sufficient commercial activity to justify purposeful availment. To any extent? No, you're not. It would have to be. That's the next question. And I think the UBIT Incorporated case is really the case that speaks to that. And that is, does the cause of action arise from the contacts? So I think one of their arguments is, well, look, even if we have these contacts, you're not complaining about advertising. You're not complaining about something that someone bought from our store or subscription. But that's not the law. The law is that if there is—and we cited some cases in our brief, Bird versus the Bird case from the Sixth Circuit, which basically says if it's related to the operative facts of the controversy, then it arises from. And so here what we have is you're selling subscriptions, you're selling targeted marketing and advertising, and you're profiting from that. How can you not be hailed into court when the thing that people come on to look at for free and share information with you, you're profiting from? And the UBIT Incorporated— And that is what is the libel. So put another way, if instead Johnson had been in a car wreck with a Huffington Post employee in some other state, that would not be something you could sue in Texas about just because 8 percent of their website is viewed by Texans. That's your point, right, that specific jurisdiction is obviously not general jurisdiction, and we're not addressing the notion that this would be general jurisdiction. Of course not. We haven't argued that. I don't think we can get general jurisdiction here. There's not enough context. But when the way I'm doing business in a state is I'm putting out these articles, I want people to come on and read them because the more traffic I get, the higher my advertising rates are. When you libel someone in connection with that form of business and you're doing business in that state by targeting the state with advertising, how can you really complain when you're dragged into court in that state? And furthermore, that is clearly arising from or related to the context, right, because that's part of the business. This is not some unrelated aspect of the business. And that was kind of the Revell case, right, was look, back in those days there were websites where you could kind of bulkhead off commercial parts of the website and non-commercial parts. But now in today's age, especially with these publications, you can't separate the two. Everything you look at on a news site is surrounded by interactive targeted advertisements and offers to buy things from the store and merchandise. So there's just no comparison with those other cases. And I really think the Mavericks case states the right principle of policy here. Is it fair for modern age media companies who are pretty much exclusively online, is it fair for them to do business everywhere, having a website that's nationwide, worldwide really, targeting advertisements, tracking traffic, making users agree to terms of service, selling advertising in those markets, but then only being hailed into court in their home state when they're sued for libel when that's part and parcel of the business? And the Mavericks case says no, that's not fair. If you're doing business in a state in the way that we just described, then you can't really be— How does Ford Motor Company case from this year that the Supreme Court decided, the one that arose in Montana where the accident was in Montana but Ford hadn't done anything with that car in Montana, but they found specific jurisdiction, how does that relate here? I realize that's not a website, but is there anything we can learn from that case? Well, I'm not—I can't say that I'm familiar specifically with that case, Your Honor, but I think what that case is touching on is another case, actually, that's cited by the Ubin Incorporated case and kind of gives the policy, which is there has to be a reasonable quid pro quo sort of relationship between what the contact is and what you're suing over. And that O'Connor v. Sandy Lane case, I believe it's from the Fourth Circuit, it's a case where someone was in Pennsylvania—sorry, it's the Third Circuit— someone's in Pennsylvania, they get a marketing material from some Caribbean island, come to our island, visit, they go to the island, they're injured. They go back to Pennsylvania and they sue. And what the court says is, look, yes, it's true that what happened on the island didn't directly arise from the advertisement that sort of brought you there, but look, you know what you're doing, you're inducing people to go to your resort, you're mailing out, targeting the state, you're profiting off of it, you can't really be heard to complain about it when you're sued in the state where someone comes from that you advertise in and then injures themselves on the island. How do you distinguish the Clemens case from our court? Well, I believe, if I recall correctly, Your Honor, that's more of a Calder-esque kind of case where it's really the targeting of the forum with the particular defamation, naming the, you know, referencing the state, interviewing witnesses, things like that. That's my recollection. Also, McNamee was a totally different entity than Huffington Post. It was an individual who gave an interview in New York and was sued in Texas, right? Yeah, I think. So we didn't have a website issue there with him. That's right. I mean, so many of those cases that sort of in the wake of Calder where people say, look, you know, I was in the state, I felt the injury in the state because you defamed me here, but that's been scaled back pretty significantly because if the article doesn't specifically talk about the state or interview witnesses in the state, then it's not really viewed as targeting the state per se. But here, it's not so much that the article, we're not really saying that the article targeted Texas. What we're saying is the website did. That's the contact. So since the article's on the website, which targets Texas and does business in Texas. And commits libel in Texas. Commits libel in Texas, but really it committed libel everywhere. If your claim is right, which it may not be. That's right. But it committed libel everywhere, just like in the Hustler case, right? The libel was everywhere. The question is did you commit libel or was there a sufficient business relationship in New Hampshire? There may have been an issue about whether the plaintiff could sue for damages outside of New Hampshire, but clearly there was conduct occurring. And of course in this case, we don't have that problem because the plaintiff lives in Texas. But time's about up. But the policy here is I think, you know, look. People have kind of criticized Zippo and said, look, you know, this was at a time when the Internet was much different and it's always very quickly evolving. You know, I think the court has to, I think the court should follow the rationalities of these cases. The cases that the court referenced in the note that we should review. The Obed Incorporated case. The Mavericks case. Because, you know, that's a progressive policy that makes sense for jurisdiction. Because otherwise, as the Mavericks case said, you're just never going to be able to sue these people in any state other than their home forum. And it's just not fair when they're, you know, deriving revenue from a particular state. They should be held into court there if they libel someone. Thank you, Mr. Sibley. You've saved time for a vote. Mr. Uhm. Good morning. May it please the court. William Uhm for Huffington Post. My co-counsel Mark Fuller is with me at the council table. So I think it's important to look at current day and how the website is used these days. Clearly the website is a source for information for a lot of people. And simply to operate a website in the cases that discuss it in the age of Internet. Some cases talking about the fact that there are 15,000 users of the Internet, which is a bygone time. Talks about the fact that simply operating a website is not enough. We need something more. Let's take Mr. Sibley's point, which he made several times. Which is that the website is, that it's the website, not the specific article. And it's the website that's soliciting business in every state, as he explained, through the use of advertisement. So respond specifically to that in the context of what we're dealing with here. Sure, Your Honor. And the Mavericks case that I think Mr. Sibley mentioned I think is instructive on that. Mavericks was very similar in the sense that Mavericks operated a celebrity chat, celebrity gossip website. That was available in every state around the world, anyone who has access to an Internet connection. So the court said, but that's not enough. Because then that would mean that there's personal jurisdiction everywhere you go, no matter what happens. And so the court in Mavericks specifically used the term and said, we need something more. Well, what was the something more? Well, the something more was the fact that the topic of the copyright infringement, there were photos. There were photos of celebrities who reside in California. There were individuals who were targeted in California. The market, the celebrity market, the entertainment market, all of that is targeted to California. And so California was not a foreign forum, for lack of a better term, for the defendant in that particular situation. And that was the something more. So what do we have in our situation? Well, we don't have any of that. What we have so far is an article that was published not just in Texas, but around the world, that was accessible by anyone who had a mobile device or an Internet connection. The article doesn't mention Texas, doesn't talk about Texas. The author of the article has never visited Texas, didn't consult any sources or the subject of Texas. But the author isn't being sued. I mean, in McNamee, the libeler, the person who supposedly told the lie, was the one being sued. So obviously his connection with Texas, where he gave the interview, all of that was relevant. That isn't the question here. This is the publication. And they are making money off of doing business in Texas off of this Web site with these articles, with the libel of a Texas resident. I understand it doesn't mention Texas. But still, how can you distinguish Keaton other than just to say, well, that was pre-Web site world? So there's a number of ways to distinguish Keaton. The first one is obviously the physical presence had an important impact because there was physical delivery of the magazine into New Hampshire. But, I mean, the publisher, the publication, did not actually have to go to New Hampshire. They could put it in a truck, and the truck can take the magazines to New Hampshire, and nobody from their company ever has to go to New Hampshire to sell a bunch of magazines there. That's no different than the Web site. Sure, and that is a fair comparison. The other distinguishing factor, and I think the more important one, is the fact that in Keaton, the important factor was the fact that the circulation of the magazines were paid for. In other words, you had to actually pay to be able to review the magazine. The magazine wasn't out there for somebody to just pick up to take a look at. You had to actually pay for it. So one sort of modern-day comparison or analogy that we can use is the idea of one of the items is newsletters comes up, where somebody says, I'm going to go ahead and join your Web site, and I'm going to make an affirmative, interactive action to sign up to receive your newsletter on a regular basis. And I'm going to pay you for it. I'm going to pay $10 a month, and you're going to send me this newsletter. That's not the fact pattern that we have here. So what you have is if you take Keaton to a sort of modern-day analogy, it would be that you'd have to pay for something, and you receive it. And in that context, although that's not the – But what about the argument that you're paying by giving all this information from yourself that you may or may not realize you're doing, and then Huffington Post is using that. Specifically in Texas, they have Texas advertising. So I live in Texas. If I went home and looked up the Huffington Post, they would find out all about me, and that they can use towards the advertising. And I would receive advertising about Texas stuff and not about New Hampshire. I wouldn't receive something about a grocery store in New Hampshire, but I would about potentially in Texas. Sure, and that is a fair point. What you describe there, though, is probably the majority of how websites operate in modern day. And again, not to get too hyperbolic with the statement, but that basically means that any website operator, including the Huffington Post, that operates a website for and has ads under the geolocation ads would be subject to personal jurisdiction in every state. But here's the rub and the important – But not on the car wreck. Well, but here's the difference and the impact here, is the fact that the article doesn't draw the advertising for the individual. So in other words, if you're searching for discussions about Texas, the football game that took place and whatnot, that is not going to generate that ad. That ad is based upon where you as a user opens up the page. But I can't get to that article unless I see all these ads. Actually, that's not true. It pops up and the ads are part of the – Right, that's what I'm saying, though. The article comes up, but there's all these ads. I can't just – I mean, it's nightmarish to do this kind of stuff. I'm not talking about the Huffington Post specifically. But just in general, you've got all these ads, you're trying to read an article, and you've got to go through this long list of advertising to get to the next paragraph as opposed to the physical newspaper that used to have to go to 7A to read the rest. Now you have to slide through all of this other stuff to get to this. I would submit, Judge Haynes, is that the court – the Fifth Circuit has already addressed that issue in Revelle. In Revelle, a similar thing happened there where Columbia University had ads. They were selling their own subscriptions to their journals, their reviews. They had items that they were selling on the website, paraphernalia for the organization, again, for the reviews that they have, the magazines. And the interactive approach in the Revelle decision was that people can sign up to be part of these newsgroups and these chat rooms, as they called it, and that's where the article or the alleged libelous article was posted. Now there's some discussions about whether that was in a bulletin board that's separate, but at the same time you still have to navigate through the website. Columbia's website exists. But was there any evidence of advertising there? Yes. Specific to Texas? There was the allegation that Columbia was selling ads. They were selling their own subscriptions to their reviews. And keep in mind, and I think it's really important to keep time periods of when that was. So Revelle was 2002, so people are now starting to get past maybe dial-up and they're starting to get some Internet, but we're not quite at 2021 where everything is through the website in terms of changeover. But they had the same factors there, which was looking at the— Specific advertising to Texas? I don't recall that they had specific— Eight percent of their materials coming to Texas? Well, the eight percent was our rebuttal to the allegations about what took place. And to be clear, the eight—I'm sorry. Please finish. Yeah, I just want to clarify the eight percent. Eight percent was not ads. Eight percent was viewed hits of the article, and only that. And the article itself did not derive or connect for additional ads popping up for Texas. And I think that's an important— That actually brings up a good point. I'm wondering if we were—because I'm not sure that our prior precedent is very helpful on this current world of website. As you say, it's expanded in my lifetime, certainly, from nothing to a lot. I'm wondering, should we articulate what the standard is and send it back so that this kind of material can be reviewed? If you're saying, no, we really don't have that much interaction with Texas at Huffington Post, it's just random, then that's something that definitely should be addressed. It seems to me that it has a lot of interaction with Texas. But if that's not true, then we would want to send it back. We would want to send it back with the proper standard. Your Honor, I would submit that there is plenty of Fifth Circuit and other authority, and particularly in the Fifth Circuit, of unbroken holdings regarding the fact that you need something more. And purposeful direction, I think, is the terminology that's used, that's directed at Texas. Now, there is the idea that Texas ads have shown up, but keep in mind, including even in the record that was submitted, Counsel for Johnson went on the website while in Texas to the Huffington Post. The article's not on that screenshot. This is R08 at 368. Has a Texas ad in there, again, not because of the article or anything about the subject matter of the article or anything that's part of the alleged libel that is at play here. It's simply the fact that the user happens to be in a location pulling it up. So I, as a lawyer from California, when I pull it up, I get something very different associated with it. And so the important factor, and I think the line of cases tell you that, is that you need something more that's purposely directed to that forum. This is not purposely directed. What about our fielding case that says, specific jurisdiction for a suit alleging the intentional tort of libel exists for a publication, which this clearly is, with adequate circulation in the state, citing Keaton. Why doesn't that apply here? It's not random. I keep thinking about when I was a state court judge, I had to run for office, so I had a website, you know, and I was in Dallas. So theoretically you could have looked me up from California, but I wasn't accessing California. I couldn't get any votes from California. So that would have been random, as opposed to, I was clearly targeting Dallas because I wanted to get votes in Dallas. So why isn't Huffington Post's circulation adequate in Texas? So I think the important thing about fielding is the fact that you need to have a connection between the alleged liability or the alleged cause of action with the particular state. So what they were trying to do is to talk. That's only when it's the author or publisher. Then it's a Calder. And again, Calder has the same situation where if you want to go to Calder, which is part of sort of the. . . No, no, no, I'm not going. What I'm saying is fielding makes the distinction between the publication, which is Huffington Post, and the author, which I don't remember the name of the author of this article, but so John Doe, okay? It treats those two differently. And on the publication, it is the Keaton test. Are you doing more than, as Judge Smith interacted with your opponent, on the issue of the random and whatever? And clearly, I don't think you're going to claim Huffington Post is randomly in Texas. No, we're not. But here's the difference in fielding. Fielding was a, again, newsletter circulation that is being directed, being sent to particular jurisdictions. This was not just a website that was being offered. It was being directed because of a newsletter concept where people sign up and they receive it. And fielding, if I recall, I don't remember the exact percentages. The percentages were less than 1%, I think was the number. And the court there analyzed that aspect of it and also focused on the fact that the defendant didn't focus and direct their attention to the jurisdiction, the forum jurisdiction that was being discussed. And again, what was missing was there was something more was missing from that case, which is why there was no grant of personal jurisdiction. And I would submit that the Huffington Post case here is no different than that. We operate a website that has articles, numerous articles, all over the place. Yes, you get targeted ads associated with it from the location where you bring it up, but it's not tied to the subject matter of the article. And so you have to make that connection to find out what actions did the defendant take knowingly, purposefully, and direct that attention to the forum in which it was being done. And how do you distinguish the Ford Motor Company case from this here? Sure, and again, I would distinguish it on the fact that there's obviously a number of different aspects of the fact that there's no website that was being discussed. Right, I know, but it's a recent U.S. Supreme Court case about personal jurisdiction on a company, Ford Motor Company, that is hardly doing most of its business in Montana. Sure. What the court found, though, and relied upon, and here's the something more that they talked about in that case, was the fact that Ford Motor Company had deliberate marketing that was targeting that industry in that state to try and go into the state, even though it didn't have any dealership, have any specific dealerships and the like, that the court found that there was enough deliberate action targeted at that forum state to find that a jurisdiction or personal jurisdiction was appropriate in that context. So, again, factually, it's very different because they weren't finding that there was personal jurisdiction in all 50 states, but the end result for Huffington Post's situation, if you find that simply operating a website that has an ad that pops up to where you have it... Well, that's where I think I would take issue, Judge Haynes, that it's targeted, but the targeted has to be connected to the article and the cause of action at play. It's not targeted from that standpoint. It's where you... It's targeted to the state, right? If I go on to the Huffington Post in Texas, I won't see ads about California, will I?  But if you're in California and you pull up the article, you're going to get a California ad... Right. ..that is different from the context... But that... Well, that's targeting California, too. Well, I think that's where the something more needs to be directed for the article and not just the business model that's being set up, because, again, not to get too hyperbolic under the circumstances, but that standard would pretty much subject websites like the Huffington Post and many other websites that operate under this business model to personal jurisdiction in all 50 states and across the globe because of where you access the Internet. Well, if you are targeting ads in Texas and the cause of action arises out of your articles, not... Again, if there was a car wreck... If I went and had a car wreck with a Huffington Post employee in California, I couldn't go sue him in Texas. It wouldn't be related to his articles and la-di-da. So that's why it's not general jurisdiction. But I... OK. No, I realise we're going back, but I think the important context there has to be that the article, subject and context has to be targeted to that forum, and it's not. It doesn't draw you a Texas ad but for that. You could look up a California article talking about the celebrities and everything that happens in California here in New Orleans, and you'll get New Orleans. That doesn't make it that you're targeting New Orleans. The article isn't being used for that purpose. And that is, I think, a very important distinction in these cases. That's why Mavericks came out the way it did because in that case, they had the something more. The subject matter, the ads that were being sold, the relationships that the publisher had with California, obviously the number was in the factual record that it was the highest circulation. That only Calder applies and Keaton is irrelevant, and that's not what Fielding says. I don't think that we would say that one test is the only test that should apply in the context of a liable case or otherwise. In fact, we would submit that, as we discussed with Keaton, you have to deal with these cases on an evolutionary basis based upon where we are today. We're not in the magazine delivery model today versus 1984. You also have the situation where the Calder and Zippo cases that we've been talking about, I think it's a false tension to create that you have to accept one test over the other. In fact, we would submit that the two tests sort of coexist because under the Zippo analysis, you're talking about sort of interactivity, minimum context, and in looking at that, you have to look at the effects that it has, and that's where you get the Calder analysis. So we would submit that both tests apply. Both tests rule against exercising personal jurisdiction, again, because you're missing that additional element of a purposeful direction to the forum state, in this case, Texas, and simply the fact that geolocation allows for an ad to pop up depending upon where you bring up the article. You could be traveling, you pull it up. That alone is not a sufficient basis to confer personal jurisdiction in the age of the website and how you access information. So it looks like I'm at the end, but I want to... So we would submit that there was sufficient basis for dismissing the case for lack of personal jurisdiction as well as denying discovery, jurisdictional discovery, which I think in the papers make clear that it's on an abusive discussion standard. All right. Thank you, Mr. Elm. Great. Thank you. Mr. Sibley, you've saved time for a bow. So I think that the Huffington Post arguments are sort of these hyper-technical, non-evolved arguments that are trying to, you know, draw distinctions which really ignore the spirit of the cases... I don't think they're hyper-technical at all.   and we try to make it as practical as possible. It's a practical account of the advent of the Internet and what it's done. It's not... You can do better than saying that these are just hyper-technical. We deal with hyper-technical things all the time. We compare Supreme Court Case A with Supreme Court Case B, and people say that's hyper-technical. That's what we do. Let me say it differently, then, Your Honour. It's form over substance. Like, for example, with the Hustler case. I mean, obviously no one contemplated what we're in today with news publications just operating exclusively online. And so we keep going back to this, oh, well, all we do is just know where people are when they click on the article. Well, it's not about the fact that they know where people are when they click on the article, which clearly they do because they knew how many people clicked on it from Texas. It's what they do with the information. They gather the information from Texas and then sell it to third parties for advertising purposes in Texas. That is doing business in Texas. That is using your website. That's how you make money now as a media entity. You're not selling print anymore. What you're selling is the advertising, and people reading it for free are really giving something up that's of value to the defendant that allows them to profit. And, you know, the undisputed jurisdictional allegations are here. They sold subscriptions in Texas. They sold merchandise from the website in Texas. They entered into contracts with Texans. They derive substantial revenue. All of that was unrebutted, so the court has to take those jurisdictional allegations as true, and I think if the court does that, this case is actually in a better situation than some of the cases that we looked at because unlike, you know, for example, the case from the Fourth Circuit, UMG Recordings, in that case there was a tiny sliver of people who clicked on this website that allowed them to basically do things to YouTube videos, and in that case what the hook was, the something more that the Huffington Post talks about was met by extracting the geographic information and then selling it to third-party advertisers. That was the same thing in Mavericks. That's the something more that's clearly here, and we have more than that. We have the sales of subscriptions. We have the sales of merchandise. We have contracts being entered into. So, I mean, I guess the issue here is, unlike those other cases, this is a libel case, right, and those are cases that dealt with copyright infringement and trademark and things like that. So I don't know that it's ever been this rationale that we're talking about with those cases has ever been applied to this specific, to libel, to what we're talking about here. But that's why I think it's important not to look at the, I won't say hyper-technical, but sort of formalistic aspects of the Keaton v. Hustler case because what's really at play there is, look, you're doing business in this forum. Even though it's a small amount, you're doing business there. And they want to say, look, we're not really doing business in Texas, and whatever business we are doing doesn't specifically relate to this article, but that's just not true. They have admitted, they track people who read the article. They know where they live. They use that information, and it says so right in the terms of service, to profit from it. That is clearly minimum context. The other thing I've heard is kind of a distinction on, well, it doesn't necessarily relate to the article because that's something different. Well, that's the UBIT case, which talks about how basically if it's related to the same set of operative facts, then it's sufficiently related for purposes of specific jurisdiction. So here what we have is a website that publishes free articles, tracks location, users come on and read, more traffic, more value for advertising. That's the way that, I mean... If no one were reading the Huffington Post in Texas, would they be able to get the Texas advertising? I doubt there would be much of a market for advertising if no one read it. I think that's the whole purpose behind tracking people's location because if you can't, it's like ratings on TV. If no one's watching, you can't get the advertising dollars. The way you get ratings on the Internet is tracking, and that's what they do, and that's the business activity that justifies jurisdiction. Thank you, Mr. Gould. Your case is under submission.